**ASG INDUSTRIES, INC., Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents,**

and

**The Atchison, Topeka & Santa Fe Ry. Co., et al., Intervening Respondents.**

**No. 75–1962.**

United States Court of Appeals, Sixth Circuit.

Argued April 5, 1976.

Decided Jan. 5, 1977.

5. *Labor Board v. Hearst, supra,* 322 U.S. at 124, 64 S.Ct. 851.

R. B. Batchelder, Omaha, Neb., Emried D. Cole, Jr., Louisville, Ky., R. K. Johnson, Chicago, Ill., F. G. Pfrommer, San Francisco, Cal., W. R. Power, St. Paul, Minn., William H. Teasley, Washington, D. C., Walter G. Treanor, Charles W. Burkett, Louis P. Warchot, San Francisco, Cal., James G. Headley, Cincinnati, Ohio, for Railway intervenors.

Walter J. Myskowski, Washington, D. C., for petitioner.

Frederick W. Read, III, Gen. Counsel, I. C. C., Washington D. C., for respondents.

Before EDWARDS and McCREE, Circuit Judges, and RUBIN,* District Judge.

CARL B. RUBIN, District Judge.

This is an appeal wherein ASG Industries seeks to vacate an order of the Interstate Commerce Commission, Division II, dated June 2, 1975. The action is brought pursuant to 28 U.S.C. §§ 2341–2349 [1] and 49 U.S.C. § 17(9). The appellee railroads have intervened in this proceeding as of right under 28 U.S.C. § 2348. The record before this court consists of the pleadings, statements of witnesses, exhibits and briefs of the parties. For the reasons hereafter stated we vacate and remand.

### I. Uncontroverted Facts

The uncontroverted facts are as follows: ASG Industries, Inc. (hereafter referred to

---

* Hon. Carl B. Rubin, United States District Judge for the Southern District of Ohio, sitting by designation.

1. 28 U.S.C. § 2342 was amended in 1975 to read in pertinent part:

The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—
(5) all rules, regulations, or final orders of the Interstate Commission Commission made reviewable by section 2321 of this title.

as "ASG") is a major domestic producer of flat glass with its principal manufacturing sites in Kingsport and Greenland, Tennessee.

The Mountain Pacific Territory, encompassing some eight western states, is a major market for flat glass products, and ASG is an active competitor in that market.

The Transcontinental Freight Bureau, (hereafter referred to as "TFB"), is the carriers' rate making body for freight moving from the east to the Mountain Pacific Territory.

Until recently, the term "flat glass" encompassed two basic categories of glass: polished and unpolished. Window glass and rolled glass are varieties of unpolished glass. Plate glass and polished wire glass are varieties of polished glass. Polished glass is a superior, more expensive product and is used where a distortion-free finish is desired. This difference in price and quality is reflected in the TFB's freight schedule. For over sixty years, "glass, window, other than plate" has traveled at a lower rate than "glass, plate, polished prism or polished wire".

In 1959 Pilkington Brothers, Ltd. of England developed a new variety of flat glass known as "float glass". It is produced by floating a layer of molten glass over molten tin. Float glass was first manufactured in this country in 1964 and by 1966 was a strong competitor in the flat glass industry. Indeed, by 1970 float glass amounted to 39.1% of the total flat glass produced in the United States. From 1966 to 1973, the production of plate glass declined while float glass production increased 130%.

Since float glass is not ground or polished, the TFB lumped it into the lower rate category of "glass, window, other than plate". Other than the method by which they are manufactured, plate glass and float glass are virtually identical products and are totally interchangeable. They are shipped in the same containers and move under the same transportation conditions. As the following table indicates, the disparity in the transcontinental rates between plate and float glass is striking.

| | Carload Rate° | Minimum Weight | Trailer on Flatcar Rate° | Minimum Weight |
|---|---|---|---|---|
| Plate Glass | 334 | 100,000 | 421 | 70,000 |
| Float Glass | 231 | 100,000 | 269 | 80,000 |

° Rates are stated in cents per pound.

The disparity between the two comes into clearer focus from the following example: A manufacturer of float glass located in Nashville, Tennessee, ships that product to California at a rate 44%–56% lower than his plate glass competitor, ASG, located in Kingsport, Tennessee, only some 250 miles to the east. Since float and plate sell for the same price and the glass manufacturer absorbs the shipping costs, ASG was required to absorb the difference in the freight rates between float and plate in order to remain competitive in the Mountain Pacific Territory.

By 1970 the TFB's dual rate scale had become an anomaly in the industry. Every other railroad rate bureau in the country had reduced or was in the process of reducing the rate on plate to that of float, and the U.S. Customs Bureau had set the same duty on imported float and plate. On December 2, 1971, ASG filed a proposal with the TFB seeking an equalization of rates (Appendix II, page 521). The proposal was approved by the Standing Rate Committee in a special notice dated December 20, 1971. (Appendix II, page 529). On January 19, 1972, the approval was cancelled without explanation. (Appendix II, page 536)

Viewing the evidence as a whole, the administrative law judge found that the rates complained of are and will be unjust and unreasonable under 49 U.S.C. § 1(5), as well as unduly prejudicial to the plaintiff and unduly preferential to its competitors under 49 U.S.C. § 3(1). He ordered that plate glass rates be adjusted down to the level of float glass rates. He awarded ASG reparations with interest on all shipments moved at the unlawful rate since December 2, 1971, in the amount of the difference between plate and float rates.

In his discussion and conclusion the administrative law judge emphasized the

TFB's unjustified refusal to change the rate schedule in the face of the competitive realities of complainant's situation and the action of all other rate bureaus.

In its order of January 14, 1975, the Commission's three member Review Board No. 4 (one member not participating) adopted the findings of fact of the administrative law judge *in toto,* and affirmed his finding of prejudice and preference under § 3(1). However, in a brief disposition of little more than a paragraph, they reversed his finding that the rates were unjust and unreasonable under § 1(5). The Review Board further held that ASG had failed to show entitlement to damages under § 3(1) and reversed the award of reparation.

On March 3, 1975, complainant petitioned the Review Board to reconsider its January 14, 1975 order. In accordance with 49 U.S.C. § 17(8) the Commission stayed its January 14, 1975 order pending disposition of ASG's petition. On June 12, 1975, the petition for reconsideration was denied. The question of equalization of the rates was resolved by the railroads on April 7, 1975, when they voluntarily reduced plate glass rates to the level of float glass. Only those portions of the Review Board's order involving § 1(5) and the denial of reparations under § 3(1) are before this Court for review.

## II. Scope of Review

▇▇▇ The judicial scope of review over the orders of the Commission is well settled: decisions of the ICC should not be disturbed unless they are unsupported by substantial evidence on the record as a whole, or were arrived at in an arbitrary or capricious manner. *Atchison, T. and S. F. Ry. v. Wichita Board of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *O–J Transport Co. v. U. S.,* 536 F.2d 126 (6th

Cir. 1976); *A. Lindberg & Sons, Inc. v. U. S.,* 408 F.Supp. 1032 (S.D.Ohio 1976). If we find such evidence as to "justify, if the trial were to a jury, a refusal to direct a verdict" and we also find a "rational connection between the facts found and the choice made", we must sustain the agency's decision. *Labor Board v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939); *Burlington Truck Lines v. U. S.,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); See also *Bowman Transportation Co., Inc. v. Arkansas-Best Freight Systems, Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

▇▇▇ The Supreme Court has held repeatedly that a court may not substitute its own view of the evidence for that of the Commission. Due deference must be accorded the Commission's expertise as to matters within its special competence, particularly in rate cases. *Mississippi Valley Barge Line Co. v. U. S.,* 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); *Interstate Commerce Commission v. City of Jersey City,* 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). As was noted in *Atchison, T. & S. F. Ry. v. Wichita Board of Trade, supra,* this deference is not without limits.[2] Mindful of these principles, we address the substantive issues at hand.

▇▇▇ As the Review Board correctly notes, the validity of rates challenged under § 1(5) is determined by examining the rate on its own merit. Although a manufacturer may enjoy a lower freight rate than his competitor, neither rate may be unreasonable under § 1(5):

A charge may be perfectly reasonable under section 1, and yet may create an unjust discrimination or an unreasonable preference under sections 2 and 3. *Interstate Commerce Commission v. Baltimore*

---

2. The clearest exposition of this position may be found in the opinion of then District Judge Peck in Cincinnati, *New Orleans and Texas Pac. Ry. v. U. S.,* 229 F.Supp. 572 (S.D.Ohio 1964), *vacated on other grounds,* 379 U.S. 642, 85 S.Ct. 610, 13 L.Ed.2d 550 (1965):

It is not the function of a court sitting in such review merely to apply a rubber stamp of

approval regardless of whether or not criteria for affirmance are established by the record. On the contrary, *to merit judicial approbation the Commission must have made certain basic, essential findings . . . , and such findings cannot be upheld unless they are clear and precise . . .* (citations omitted) (emphasis added).

& O. R. R., 145 U.S. 263, 277, 12 S.Ct. 844, 848, 36 L.Ed.2d 699 (1892).

The burden is upon a complainant to show that an existing freight rate is unreasonable in fact. *Louisville & R. R. v. U. S.*, 238 U.S. 1, 35 S.Ct. 696, 59 L.Ed. 1177 (1915). If a rate is found to be unreasonable under § 1(5), amounts charged in excess of the reasonable rates are awarded automatically to the shipper as overcharges. *Interstate Commerce Commission v. U. S., ex rel. Campbell*, 289 U.S. 385, 391, 53 S.Ct. 607, 77 L.Ed. 1273 (1933).

No mathematical formulae exist for determining the reasonableness of rates, but one of the best tests for reasonableness was first set forth in *Louisville & N. R. R. v. U. S., supra* 238 U.S. at 15–16, 35 S.Ct. at 700.

> Giving the widest possible effect to the fact that mere comparison between rates does not necessarily tend to establish the reasonableness of either, it is still true that, when one of many rates is found to be higher than all others, there may arise a presumption that the single rate is high . . . The capital invested, the traffic hauled, the cost of operation and the earnings might differ, but nevertheless what was shown to be a reasonable rate on one, might, after allowing for the dissimilarity in conditions, earnings and costs, be a factor in determining the reasonableness of the rate on the other.

■ The Review Board found that float and plate glass are "homogeneous commodities" which "move under the same transportation circumstances and conditions" and "sell for the same delivered price". (Appendix I, p. 6) It also found that the TFB's rate for moving these homogeneous commodities from the east to the Mountain Pacific Territory was up to 56% higher on the one than on the other; and that as of 1970 this disparity was being or had been eradicated in every other freight bureau in the country. (Appendix I, pp. 6–7) Paying no heed either to these findings or to the principles of law stated above, the Review Board summarily found that the separate rates on plate glass were within the zone of reasonableness.

Lacking a rational connection to the facts found, this decision must be rejected as both arbitrary and capricious. Given the Review Board's findings of fact, ASG is at least entitled to a determination of whether its proof was sufficient to trigger the rebuttal presumption set forth in *Louisville & N. R. R. v. U. S., supra.* If the Review Board finds that such proof is sufficient to trigger the presumption, then the burden shifts to the defendant railroads to justify the rate. The Commission's own precedents are in accord with this maxim. See, *International Minerals & Chemicals Corp. v. Atchison, T. & S. F. Ry.*, 303 I.C.C. 603, 607 (1958); *Lobdell-Emery Manufacturing Company v. Ann Arbor R. R.*, 156 I.C.C. 569–570 (1929).

■ There is, of course, a broad range of reasonableness which exists between maximum and minimum rates. *U. S. v. Chicago, M., St. P. & Pac. R. R.*, 294 U.S. 499–506, 55 S.Ct. 462, 79 L.Ed. 1023 (1935). But a determination of what falls within that zone of reasonableness must require more than a rote recitation of the standard itself. The record before us does not reveal how the Review Board arrived at its decision on this issue.

■ The Review Board found (and that finding is not challenged herein) that the rates in question are unduly prejudicial to ASG and unduly preferential to its float glass competitors. (Appendix I, p. 13) Only the propriety of the Review Board's decision denying an award of reparations under § 3(1) remains for consideration. Unlike a finding of unreasonableness under § 1(5), an award of reparations does not automatically flow from a finding of prejudicial and preferential rates. Under 49 U.S.C. § 8 complainant must prove that it was injured as a consequence of the prejudicial rate and that it sustained damages as a result of the injury. Complainant's burden of proof was more fully expounded in *I. C. C. v. U. S. ex rel Campbell, supra* 289 U.S. at 391, 392–393, 53 S.Ct. at 610.

The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how

much worse off it is because others have paid less. . . . The rulings of the Commission are consistent to the effect that the absorption by a complainant of a discriminatory charge does not avail to establish damage, or to measure its extent, in the absence of a showing that prices were affected by the differential rate. There must be full disclosure of the conditions of the business, or of those affecting competition, including, in particular, the capacity of the preferred producers to fix the prices for the market. Only then will the ultimate fact of damage emerge from the evidentiary facts as an appropriate conclusion.

Complainant must therefore not only show the fact and the amount of damages with the same degree of certainty as in a court of law (*Pennsylvania R. R. v. International Coal Co.*, 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446 (1913)); it must also show that by reason of the prejudicial rates its competitors had the capacity to fix the price on the commodity.

 The Review Board found that ASG's "ability to compete is impaired substantially by the lower freight rates", (Appendix I, p. 14) and that ASG was "absorbing a penalty on its plate glass in order to remain competitive with float glass manufacturers". (Appendix I, p. 8) It also found that the company had lost over $600,000 in business between 1965 and 1966 "due in major part to the more favorable freight rates existing on plate glass". The record further indicates that during the first nine months of 1970 ASG experienced a net operating loss of $119,453.00. During that same period it was forced to absorb some $92,869.00 in freight rates to the West Coast as a result of the spread in rates of float and plate glass. (Appendix I, p. 27) Despite these findings, the Review Board

held that there was no evidence that complainant's float glass competitors had "set the price of float and plate glass", and that the amount of any damages which may have been sustained was "clearly speculative." (Appendix I, pp. 16–17).

Such conclusion requires reversal under the arbitrary and capricious standard. This is not a case such as *I. C. C. v. U. S., ex rel Campbell, supra,* where the shipper merely felt cheated that his competitors had enjoyed a lower freight rate.[3] Rather, this is a case comparable to *Associated Bristol, Tenn., Retail Coal Dealers v. Southern R. R.,* 255 I.C.C. 228 (1943) reversing *Associated, Bristol, Tenn., Retail Coal Dealers v. Southern R. R.,* 253 I.C.C. 639 (1942), where the complainants' rate on coal was increased ten cents over that of its competitors. In reversing its prior order denying reparations, the Commission concluded:

> It is indicated that, when the increased rate was collected, complainants were in certain instances unable, because of the small margin of profit, to meet the price of competitors who had the preferential rate. It appears that complainants' competitors were then in a position to control the price of coal in Bristol, that the price was held down by the preferential rate of $1.24, applicable on competitors' coal, and that the maintenance of this rate and the payment by complainants of charges at the unduly prejudicial rate of $1.34 were the causes or would be the causes of the loss of profits to complainants in the amount per ton claimed.

Reparations in the amount of ten cents per ton of coal shipped under the $1.34 rate were awarded.

We have reviewed many of the Commission's decisions in which the test enunciated in *I.C.C. v. U.S. ex rel Campbell* was applied.[4] None of these decisions would ap-

---

3. *See* the Commission's opinion in *Campbell, Birch Valley Lumber Co. v. Strouds Creek & Muddlety R. R.,* 144 I.C.C. 419 (1928).

4. A partial list would include the following: *Sullivan-Hays Coal Co. v. New York N. H. & H. R. R.,* 194 I.C.C. 66 (1933); *Blackmer & Post Pipe Co. v. Atchison, T. & S. F. Ry.,* 195

I.C.C. 661 (1933); *Manchester Biscuit Co. v. Chicago, M., St. P. & Pac. R. R.,* 214 I.C.C. 651 (1936); *Mohawk Petroleum Co. v. Atchison, T. n S. F. Ry.,* 216 I.C.C. 155 (1936); *Lake Shore Tire & Rubber Co. v. Central Vermont Transportation Co.,* 222 I.C.C. 369 (1937); *Fairbanks-Moore & Co. v. Alton & S. R. R., 251 I.C.C. 181 (1942); Associated, Bris-*

pear to require a greater showing of "capacity to fix prices" than that found in *Associated, Bristol, Tenn., Retail Coal Dealers, supra,* or that found in this case. See also *Stauffer Chemical Co. v. Fort Worth & D. Ry.,* 315 I.C.C. 63 (1961) *rev'g in part Stauffer Chemical Co. v. Fort Worth & D. Ry.,* 313 I.C.C. 393, 396 (1961) (cited in Review Board decision); *Mohawk Petroleum Co. v. Atchison, T. & S. F. Ry.,* 216 I.C.C. 155 (1936).

It is possible that complainant failed to meet its burden of proof as to this element of its cause of action, but the Review Board's decision is silent as to such failure. Lacking an explanation, it is impossible to sustain its decision.

The Review Board makes passing mention of the effect of foreign competition on plaintiffs' ability to market its product. There is little if any evidence in the record upon which to base a conclusion concerning the extent of this foreign influence on the market. As was stated in *Central & Southern Motor Freight Tariff Association v. U. S.,* 273 F.Supp. 823, 834 (D.Del.1967), a deficient record cannot be remedied by after-the-fact theories of counsel for the defendant. Upon remand, the Review Board may wish to hear additional evidence on this question.

■ As to the amount of damages sustained by ASG, we agree with the Review Board that the "measure of damages is not necessarily the difference between one rate and another." Rather, complainant is entitled to the amount of damage which it proves it has incurred.

> Those damages might be the same as the rebate, or less than the rebate, or many times greater than the rebate; but unless they were proved, they could not be recovered. Whatever they were they could be recovered. *Pennsylvania R. Co. v. International Coal Mining Co.,* 230 U.S. 184, 203, 33 S.Ct. 893, 57 L.Ed. 1446 (1913),

cited in *Meeker & Co. v. Lehigh Valley R. R.,* 236 U.S. 412, 429, 35 S.Ct. 328, 335, 59 L.Ed. 644 (1915).

We are unable to accept the Review Board's belief that the measure of damages for prejudicial rates is an all-or-nothing proposition. It does not follow that if ASG is not entitled to full reparations based on the actual rate differential for all years subsequent to 1964, it is therefore entitled to nothing at all. A potentially difficult calculation of a shipper's actual damages cannot be sidestepped by characterizing its proof as fitting into neither of two rigid categories. It does not appear that the Review Board has given due consideration to applicable legal standards or its own findings of fact in the determination of this question.

## CONCLUSIONS

Accordingly, the Commission's decision must be vacated and remanded. *U. S. v. Saskatchewan Minerals,* 385 U.S. 94, 87 S.Ct. 254, 17 L.Ed.2d 192 (1966). It is not enough for an administrative agency to assert "expertise" as a defense for all seasons.

■ Where, as here, an agency has adopted all the findings of fact of its administrative law judge and then reached conclusions of law at variance with those findings, it must demonstrate more than expertise:

> Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government can become a monster which rules with no practical limits on its discretion.' (citation omitted) *Burlington Truck Lines v. U. S.,* 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

As the Supreme Court reiterated in *Atchison T. & S. F. Ry. v. Wichita Board of*

tol, *Tenn., Retail Coal Dealers v. Southern Ry.,* 253 I.C.C. 639, 644 (1942); *Associated, Bristol, Tenn., Retail Coal Dealers v. Southern Ry.,* 283 I.C.C. 387 (1951); *Mayo Shell Corp. v. Chicago, R. I. & Pac. R. R.,* 293 I.C.C. 243 (1954); *Stauffer Chemical Co. v. Fort*

*Worth & D. Ry.,* 313 I.C.C. 393 (1961); *Stauffer Chemical Co. v. Fort Worth & D. Ry.,* 315 I.C.C. 63 (1961); *Mathhissen & Hegeler Zinc, et al. v. Baltimore & O. R. R.,* 323 I.C.C. 601 (1945); *Public Belt R. R. Commission v. Aberdeen & R. R. R.,* 335 I.C.C. 162 (1969).

*Trade, supra* 412 U.S. at 807, 93 S.Ct. at 2374:

> The agency must set forth clearly the grounds on which it acted. For "[w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States v. Chicago, M. St. P. & P. R. Co.,* 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935).

A complainant is entitled as a matter of right to an exposition of an agency's unfavorable decision. A reviewing court is entitled as a matter of law to such an exposition in order to uphold it against a claim of arbitrariness and caprice.

Accordingly, the orders of the Commission are hereby VACATED and this matter is REMANDED for further proceedings consistent with this opinion.